IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**UNITED STATES OF AMERICA**,
Appellee,

v.

**SHARON BARNES SUTTON**,
Appellant.

On appeal from the United States District Court
for the Northern District of Georgia

**BRIEF OF APPELLANT
SHARON BARNES SUTTON**

MILDRED GECKLER DUNN
V. NATASHA PERDEW SILAS
Federal Defender Program, Inc.
101 Marietta Street, NW, Suite 1500
Atlanta, GA 30303
(404) 688-7530
Millie_Dunn@FD.org
Natasha_Silas@FD.org

Counsel for Sharon Barnes Sutton

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(a), counsel certifies that the following have an interest in the outcome of this appeal:

Buchanan, Ryan, United States Attorney

Cohen, Mark H., United States District Judge

Dickson, Jordan, United States Department of Justice Trial Attorney

Dunn, Mildred Geckler, Attorney for Appellant

Kearns, Stephanie A., Executive Director, Federal Defender Program

Larkins, John K., United States Magistrate Judge

Salgado, Victor R., United States Department of Justice Trial Attorney

Silas, V. Natasha Perdew, Attorney for Appellant

Sutton, Sharon Barnes, Appellant

Vaughn, Amanda, Former United States Department of Justice Attorney

Veasley, Reginald, Victim

Mr. Williams, Bret R., (deceased) Former Attorney for Appellant

United States of America, Appellee

No publicly-traded company or corporation has an interest in the outcome of this case or of this appeal.

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Rule 34(a)(2)(C) of the Federal Rules of Appellate Procedure, Ms. Sutton requests oral argument because it would significantly aid in the decisional process, given the fact-intensive issues raised and the importance of the constitutional issues presented. The Court and parties would benefit from the extended review afforded by oral argument.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement... C1-1

Statement Regarding Oral Argument.................................................. i

Table of Contents ................................................................ ii

Table Of Citations ............................................................. iv

Statement of Jurisdiction.........................................................1

Statement of the Case ............................................................3

    A.    Course of Proceedings and Disposition Below............................3

    B.    Statement of Facts.....................................................4

    C.    Standard of Review....................................................15

Summary of the Argument..........................................................17

Argument and Citation of Authority...............................................19

I.    The Government Offered Insufficient Evidence of Hobbs Act Extortion..........................................................................19

    A.    No evidence of knowledge or exploitation of fear......................20

    B.    The fear must be of loss of something Veasley already has, not a future interest.................................................25

    C.    It was not reasonable for Veasley to believe that Ms. Sutton had the power to cancel the Tetra Tech contract.........................27

    D.    It was not reasonable for Veasley to believe that Ms. Sutton would take any action to cancel the Tetra Tech contract ..........28

II.    "Extortion" Based On "Fear" In The Hobbs Act Extortion Statute Is Void For Vagueness As Applied To Ms. Sutton Conduct .......................................................................................31

III.   The Court Violated Ms. Sutton's Fifth and Sixth Amendment Right to Present A Complete Defense by Excluding Expert Testimony About Ms. Sutton's ██████████ ███████████████████████ At The Time Of The Charged Crime, Evidence Of Which Bears On Her State Of Mind In A Specific Intent Case ..............................................35

    A.    The Fifth and Sixth Amendments require that a Defendant be allowed to present a complete defense. ...................................35

    B.    ████████████████████████████ ████████████████ ...........................................................43

    C.    The trial court violated Ms. Sutton's Fifth and Sixth Amendment right to present a complete defense and meet the government's evidence of *mens rea* in a specific intent case by excluding ███ ████████████████████ expert testimony ....47

IV.   The Court Precluded Ms. Sutton A Meaningful Opportunity To Present A Complete Defense By Precluding Her Impeachment By Omission On The Government's Sole Witness As To Hobbs Act Extortion By Fear........................................................................47

Conclusion.......................................................................................51

Certificate of Compliance and Service ............................................52

# Table of Authorities

**Federal Cases**                                                    **Cases Page(s)**

*Barefoot v. Estelle,*
   463 U.S. 880 (1983) ................................................................. 42, 43
*Bonner v. City of Prichard,*
   661 F.2d 1206 (11th Cir. 1981) ....................................................... 49
*Castillo v. United States,*
   409 F.2d 762 (5th Cir. 1969) .......................................................... 49
*Chapman v. United States,*
   500 U.S. 453 (1991) ..................................................................... 35
*Crane v. Kentucky,*
   476 U.S. 683 (1986) ............................................................... 35, 47
*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ......................................................... 44, 45, 46
*In re Cumbess,*
   960 F.3d 1325 (11th Cir. 2020) ...................................................... 33
*Jackson v. Virginia,*
   443 U.S. 307 (1979) ..................................................................... 19
*Jencks v. United States,*
   353 U.S. 657 (1957) ..................................................................... 49
*Johnson v. United States,*
   576 U.S. 591 (2015) ..................................................................... 31
*Kolender v. Lawson,*
   461 U.S. 352 (1983) ..................................................................... 32
*Maynard v. Cartwright,*
   486 U.S. 356 (1988) ..................................................................... 32
*United States v. Abel,*
   469 U.S. 45 (1985) ................................................................. 48, 49
*United States v. Arias-Izquierdo,*
   449 F.3d 1168 (11th Cir. 2006) ...................................................... 48
*United States v. Bass,*
   404 U.S. 336 (1971) ............................................................... 34, 35
*United States v. Bates,*
   960 F. 3d 1278 (11th Cir. 2020) ..................................................... 37
*United States v. Brown,*
   415 F.3d 1257 (11th Cir. 2005) ...................................................... 47

*United States v. Cameron,
907 F.2d 1051 (11th Cir. 1990) ...................................................... 36, 43, 44, 45

*United States v. Canniff,
955 F.3d 1183 (11th Cir. 2020) ......................................................... 34

United States v. Capo,
817 F.2d 947 (2nd Cir. 1987) ............................................................ 25

United States v. Cronic,
466 U.S. 648, (1984) .......................................................................... 36

United States v. Davis,
139 S. Ct. 2319 (2019) ....................................................................... 34

United States v. Diaz,
26 F.3d 1533 (11th Cir. 1994) ........................................................... 50

United States v. Edwards,
2018 WL 11214816 (S.D.Fla. 2018) ............................................. 44, 45

United States v. Frisbee,
623 F.Supp 1217 (N.D.Cal. 1985) ..................................................... 46

United States v. Garcia,
907 F.2d 380 (2nd Cir. 1990) ................................................. 25, 27, 29

United States v. Gillis,
938 F.3d 1181 (11th Cir. 2019) ......................................................... 37

United States v. Gold,
661 F.Supp 1127 (D.C. 1987) ............................................................ 46

United States v. Grigsby,
111 F.3d 806 (11th Cir. 1997) ........................................................... 19

*United States v. Haimowitz,
725 F.2d 1561 (11th Cir. 1984) ......................................................... 20

United States v. Hansen,
262 F.3d 1217 (11th Cir. 2001) ......................................................... 19

United States v. Harris,
20 F.3d 455 (11th Cir. 1994) ............................................................. 20

United States v. Hayden,
64 F.3d 126 (3d Cir. 1995) ................................................................ 45

United States v. Kelly,
888 F.2d 732 (11th Cir. 1989) ...................................................... 15, 19

*United States v. Kopituk,*
  690 F.2d 1289 (11th Cir. 1982) ....................................... 27

*United States v. L. Cohen Grocery Co.,*
  255 U.S. 81 (1921) ....................................................... 32

*United States v. Lamarre,*
  248 F.3d 642 (7th Cir. 2001) ......................................... 45

*\*United States v. Lanier,*
  520 U.S. 259 (1997) ................................................. 31, 34

*\*United States v. Litzky,*
  18 F.4th 1296 (11th Cir. 2021) ..................................... 42

*United States v. Massey,*
  89 F.3d 1433 (11th Cir. 1996) ...................................... 15

*United States v. Mister,*
  553 F.Supp.2d 377 (D.N.J. 2008) ................................. 45

*United States v. Quinn,*
  514 F.2d 1250 (5th Cir. 1975) ...................................... 27

*United States v. Rahm,*
  993 F.2d 1405 (9th Cir. 1993) ...................................... 45

*United States v. Rushin,*
  844 F.3d 933 (11th Cir. 2016) .................................. 16, 50

*United States v. Sacks,*
  2009 WL 4114169 (D.N.J. 2009) ................................. 45

*United States v. Sanchez,*
  722 F.2d 1501 (11th Cir. 1984) .................................... 19

*United States v. Sarras,*
  575 F.3d 1191 (11th Cir. 2019) .................................... 15

*\*United States v. Tomblin,*
  46 F.3d 1369 (5th Cir. 1995) ........................................ 25

*United States v. Wayerski,*
  624 F.3d 1342 (11th Cir. 2010) .................................... 15

*United States v. Williams,*
  583 F.2d 1194 (2d Cir. 1978) ....................................... 42

*Washington v. Texas,*
  388 U.S. 14 (1967) ....................................................... 36

*Wooden v. United States,*
  142 S. Ct. 1063 (2022) ................................................. 35

**Federal Statutes & Rules**

18 U.S.C. § 17 ..................................................................................... 36

18 U.S.C. § 666 ...................................................................................... 3

18 U.S.C. § 1951 ..................................................................................... 3

18 U.S.C. § 3231 ..................................................................................... 1

18 U.S.C. § 3742 ..................................................................................... 1

28 U.S.C. § 1291 ..................................................................................... 1

FED. R. APP. P. 4(b)(1)(A) ...................................................................... 1

Fed. R. App. P. 32 ................................................................................... 52

Fed. R. Crim. P. 12.2 ............................................................................... 3

Fed. R. Crim. P. 29 .................................................................................. 3

Fed. R. App. P. 34 .................................................................................... i

Fed. R. Evid. 704 ............................................................................... 42, 46

\*   Pursuant to 11th Cir. R. 28-1(e), Ms. Sutton notes that she primarily
    relies upon these citations.

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

**UNITED STATES OF AMERICA**,
Appellee,

v.

**SHARON BARNES SUTTON**,
Appellant.

———————————————

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over this case under 18 U.S.C.
§ 3231 because an indictment was filed charging Ms. Sutton with federal
crimes. This is a direct appeal from an order and judgment of the district
court; the Court of Appeals has jurisdiction over this appeal under 18
U.S.C. § 3742 and 28 U.S.C. § 1291. Ms. Sutton filed the notice of appeal on
February 28, 2023, (Doc. 221), within 14 days of the entry of the district
court's judgment and commitment order. FED. R. APP. P. 4(b)(1)(A). This
appeal is from a final order of the district court that disposes of all the
parties' claims in this case.

## STATEMENT OF THE ISSUE(S)

I.     Whether the government offered insufficient evidence of Hobbs Act extortion by fear?

II.     Whether "extortion" based on "fear" in the Hobbs Act extortion statute is void for vagueness as applied to Ms. Sutton's conduct?

III.     Whether the court violated Ms. Sutton's Fifth and Sixth Amendment right to present a complete defense by excluding expert testimony about Ms. Sutton's ███████████████████████ ███████████████████ at the time of the charged crime, evidence of which bears on her state of mind in a specific intent case?

IV.     Whether the court Violated the Fifth and Sixth Amendment by precluding Ms. Sutton a meaningful opportunity to present a complete defense by precluding her impeachment by omission on the government's sole witness as to Hobbs Act extortion by fear?

## STATEMENT OF THE CASE

**A.    Course of Proceedings and Disposition Below**

On May 15, 2019, Ms. Sutton was charged with Hobbs Act extortion by fear of economic loss, in violation of 18 U.S.C. § 1951 (Counts One and Two), and with bribery concerning a program receiving federal funds, in violation of 18 U.S.C. § 666 (Count Three).  (Doc. 1).  Ms. Sutton pleaded not guilty. (Doc. 8).

After the case had been certified ready for trial, (Doc. 26), Ms. Sutton filed a motion asking for leave to file a notice pursuant to Federal Rule of Criminal Procedure 12.2(b) out of time.  (Doc. 75).  The motion was granted. (Doc. 85).  She then filed the Rule 12.2(b) notice. (Doc. 86).  On June 21, 2022, the government filed a motion to exclude mental health expert testimony.  (Doc. 98 under seal).  After briefing, (Docs. 101-102), the court granted the government's motion to exclude.  (Doc. 109 under seal).

Ms. Suttons' jury trial began on October 25, 2022, and concluded on November 2, 2022. (Docs. 169-173, 175-177).  At the close of the government's case, Ms. Sutton moved for Rule 29 Judgment of Acquittal, arguing that there was insufficient evidence of Hobbs Act extortion by fear of economic harm and that as applied to her conduct, Hobbs Act extortion by fear of economic harm was void for vagueness. (Doc. 205 at 144-147).  After trial, Ms. Sutton filed a Rule 29(c) motion, again asking for a judgment of acquittal based on the insufficiency of the evidence. (Docs. 190, 195).  The Court denied both Rule 29 motions.  (Doc. 205 at 154; Doc.

218).  The jury found Ms. Sutton guilty of Counts One and Two but acquitted her on Count Three. (Doc. 183).

The trial court sentenced Ms. Sutton to three years of probation, a special assessment of $200, and a $3,000 fine.  (Doc. 220).  Ms. Sutton timely filed her Notice of Appeal.  (Doc. 221).

## B.  Statement of Facts

### 1.  Background.

Sharon Barnes Sutton was raised in a segregated, but loving and supportive community in north Birmingham, Alabama, called Collegeville. (Doc. 214 at 3).  It was the 1960s, the middle of the civil rights movement, and "the Birmingham Movement, with its police dogs and fire hoses" was "all around [them]" as they grew up.  *Id.*  She grew up with an awareness of the need for progress for their community. *Id.* Ms. Sutton gained admission to the University of Alabama and earned her Bachelor's degree, which was a "major milestone for her family and community." (*Id*. at 4-5). She earned a master's degree from Mercer University and a teaching certificate from the University of West Georgia. She also later began a doctoral program in Instructional Technology. (*Id.* at 5).

She volunteered at her children's schools. She served in leadership as a PTA President. *Id.* She was "instrumental" in the reopening of a local closed elementary school and in the opening of a new middle school in DeKalb County neighborhood.  (*Id.* at 6).  She followed her passion helping her community and became a teacher with DeKalb County in 1999. (*Id.* at

4

7).  In 2008, again following her passion to help her community, Ms. Sutton ran for and won office as one of seven representatives on the DeKalb County Board of Commissioners (the "Board"). (*Id*. at 9-10;204 at 47-48). She won reelection in 2012, prior to ███████████████████ ████████ (*Id*. at 10; 204 at 95-96).

While on the Dekalb County Commission, Ms. Sutton continued to champion projects to improve DeKalb County.  Her legacy includes the Wade Walker YMCA, the establishment of a Solicitor for the DeKalb County Recorder's Court, and the DeKalb Youth Leadership Academy (YLA). (*Id*. at 10).

Two trial witnesses testified about the importance of the Wade Walker YMCA and Ms. Sutton's role in opening it and that YMCA is in an underserved neighborhood. (Doc. 203 at 28-29; Doc. 204 at 61-70). That YMCA provided a safe haven for kids and families, and had two swimming pools, a gymnasium, a weight room, and a daycare. (Doc. 203 at 28-29; Doc. 204 at 70).  Ms. Sutton championed the project at her first meeting as a Commissioner, pitting her against the DeKalb County Chief Executive Officer ("CEO"), Burrell Ellis. (*Id*. at 70, 76-77*).*  Morris Williams testified at trial about how Ms. Sutton had to stand up to political adversaries to make the YMCA a reality for her constituents. (*Id*.).

Ms. Sutton also championed a prosecutor's office for the DeKalb County Recorder's Court so that citizens could negotiate the resolution of tickets and other minor legal matters, an initiative important to the citizens

of DeKalb County, which has impacted the quality of justice for thousands of individuals who enter the Court hoping for fair outcomes. (*Id.* at 11-12).

Ms. Sutton established the DeKalb Youth Leadership Academy when she saw a need to inspire the youth of DeKalb County. She wanted to sew into them belief in their own potential. And in 2009 she made it happen. (*Id*. at 12).

But in focusing on her initiatives, Ms. Sutton stirred things up, earning the ire of the CEO Ellis. (Doc. 203 at 85; Doc. 204 at 48-50, 76). She was being constantly attacked politically. (Doc. 203 at 85; 204 at 102). And the CEO began bullying Ms. Sutton. (Doc. 204 at 76, 78, 96, 102). Early on, Ms. Sutton attempted a political reorganization that would strip the CEO of power, which further alienated her from the CEO and those aligned with him politically. (*Id*. at 77). And Ms. Sutton was terminated from her teaching job, she believed, because CEO Ellis 's political animosity towards her. (*Id*. at 18). Then, in late 2012, Ms. Sutton suffered serious health issues discussed below.

### 2. Overview of the case.

The government charged Ms. Sutton with two counts of Hobbs Act extortion by fear of economic loss and bribery. (Doc. 1). The government's evidence showed that Ms. Sutton held one of seven seats on the Board. (Doc. 202 at 150). DeKalb County was under a federal consent decree requiring it to upgrade its wastewater management system. (*Id.* at 41;204 at 39-44). In 2013, the Board, after a rigorous and contested bidding process,

controlled by people appointed by the CEO, awarded a large sewer contract to Tetra Tech. (Doc. 202 at 41-42;204 at 35-38). One of Tetra Tech's subcontractors was Environmental Consortium, L.L.C., whose President was Reginald Veasley. (Doc. 202 at 31, 43-44). Veasley worked in the wastewater industry for over 28 years. (*Id*. at 37). Veasley was also best friends with DeKalb County insider, Morris Williams, who he described as "a very seasoned government guy." (*Id*. at 71). Williams worked for DeKalb County for twenty years and was the Assistant County Administrator, Chief of Staff to the Board until 2014, and then was the Deputy Chief Operating Officer of Public Works, with authority over Watershed Management, the DeKalb County department overseeing the contract. (Doc. 204 at 190-191).

Ms. Sutton's trial defense was that she was collecting money for a legal defense fund. (Docs. 202 at 27-31, 95, 99, 115-117, 121-122; 203 at 207; 205 at 95-96, 98; 206 at 8, 11, 14-15, 19, 30, 46, 48-51, 53, 55-56). The evidence at trial showed that during this time, Williams helped Ms. Sutton raise funds for various things, including campaign contributions. (Doc. 204 at 83). It also showed that Williams knew that Ms. Sutton had large legal bills for legal work her lawyers, Bell & Washington, had done for her as a commissioner. (*Id*.). Williams described these as county expenses, which were previously paid by the CEO, but the CEO was under indictment and

therefore refused to pay them at that time.  (Doc. 204 at 83-84).[1]  Thus, Ms. Sutton needed to find a way to pay her Commission business legal expenses and began a legal defense fund.  (*Id.*).

At this time, unbeknownst to Ms. Sutton, Williams was a confidential informant for the FBI. (Doc. 204 at 104-113).   Williams had been caught in serious criminal conduct involving and was afraid of prosecution, going to jail, and losing his county pension. (Doc. 2-4 at 209-113).   He was specifically targeted by the government in order to extort cooperation from him against Ms. Sutton.  (Doc. 204 at 106-108; Def. Exh. 52).  In fact, the initial agreement he signed with the government specifically (and only) mentioned Ms. Sutton as someone he would cooperate against. (*Id.*).[2]

It is against this backdrop of Ms. Sutton's need to raise money for legal fees and Williams need to help the government in order to help himself, that in May of 2014, Williams sent his friend Veasley to see Ms. Sutton.  Ms. Sutton asked him for $500.  Veasley gave her $500 on June 4, 2014 and $500 on July 28, 2014.  The government alleged that these two payments were both bribes and Hobbs Act extortion by fear of economic

---

[1] The legal fees grew out of earlier investigations.  Ms. Sutton had been under investigated by the government since she took office.  (Doc. 204 at 48).  Williams testified that the investigations were politically motivated. (Doc.204 at 102).

[2] Based on his good work for the government, Williams was not prosecuted for a felony, did not do jail time, was allowed to retire, and continues to receive his pension. (Doc. 203 at 190).

loss, but did not allege that they were Hobbs Act extortion under color of law. (Doc. 1).  Ms. Sutton was acquitted of bribery.

The government argued that the conduct was extortion by fear because Ms. Sutton was a commissioner and Veasley was doing business with the county. (Doc. 206 at 6-8, 14-16).  In this context, the government argued inferences of guilt from some of the behavior of Ms. Sutton at the time. (*Id.*).  Ms. Sutton was precluded from having her expert testify about counter-inferences from the same behavior, ███████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ (Doc. 206, 9-10).  Ms. Sutton never disputed asking for money but denied it was extortion, as she did not believe Veasley was fearful, no one ever advised her he was fearful, and she did not exploit fear in any way.

### 3. Evidence regarding Ms. Sutton's mental state, state of mind, and *mens rea* excluded by trial court.

During the summer of 2014, ██████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████



(Doc. 101 at 15).





### 4.    Trial testimony – impeachment by omission.

At trial, Veasley described the interactions with Ms. Sutton. Obviously, his credibility about the events and his fear were critical to the decision the jury would make.  Impeaching him in order to undermine his testimony was imperative to the defense.

Veasley testified that Ms. Sutton asked for $500 and mouthed "a month."  This was at odds with his grand jury testimony, where he did not recount that alleged detail in his grand jury testimony.   On cross examination, the defense contested that she mouthed "a month," which would suggest that the payments were meant to be ongoing, rather than a finite amount payable to Ms. Sutton's legal defense fund.  (Doc. 202 at 151).

Veasley admitted that he had met with the government five or six times.  (*Id.*).  In response to the question, "You never said that she mouthed 'a month' to the FBI in any of the previous meetings?"; he answered, "They would have that transcript.  I don't know exactly what we discussed every time."  (*Id.*).  Defense counsel then called Veasley's attention to Defense Exhibit 103, Veasley's grand jury testimony.  (Doc. 202 at 152).  The government objected at this point and asked to approach the bench.  In the presence of the jury, the trial court suggests that defense counsel was merely trying to refresh Mr. Vealey's recollection, but counsel stated, to the contrary, that she intended to impeach Veasley with his sworn testimony.  (Doc. 202 at 153).  Further discussion occurs at the bench.  The government argued that Veasley's statement is not an omission with which the defense

can impeach.  At first, the trial court correctly stated, "Whether it is or isn't is for the jury to determine."  (*Id.).*  The government pressed further, and the trial court then reversed itself, sustaining the government's objection and disallowing the critical impeachment.  (Doc. 202 at 156).

A review of Veasley's grand jury testimony illustrates the trial court's error:

Q: How did she make the request?

A: She wrote down a number and slid it to me.

Q: What was the number she wrote down?

A: Five hundred.

Q: Did it have a dollar sign if you remember?

A: I don't know, I don't remember a dollar sign.

Q: What did you understand her to be asking you for?

A: Five-hundred dollars.

(Grand jury testimony[4] at 17).

The trial court's stated reason for disallowing this crucial impeachment was because Veasley "wasn't asked a specific question about the regularity of the payment in terms of was it going to be monthly, weekly, yearly, or whatever. " (Doc. 202 at 156).  The court continued:

I tend to agree with the government here.  It is not -- there's nothing in here where he was asked about the regularity of -- where he got monthly from.  So you're trying to impeach him by

---

[4] This Exhibit was filed with this Court at Doc. 26.

not volunteering information, and that's a different situation than answering differently.

*(Id.).* The defense objected:

> But the actual question wasn't as narrow as that. "What did you understand her to be asking for?" So that is my argument. If I'm making it for the record, that is my argument. . . . it's impeachment by omission, and I think it's proper.

*(Id.).*

## C. Standard of Review

I. Sufficiency of the evidence is a question of law which this Court reviews *de novo. United States v. Kelly*, 888 F.2d 732, 739 (11th Cir. 1989). This Court examines the evidence, including all reasonable inferences and credibility choices, in the light most favorable to the government. *Id.* at 740. The inquiry is whether a factfinder could find that the evidence establishes guilt beyond a reasonable doubt. *Id.*

II. This Court reviews *de novo* "whether a criminal statute is unconstitutionally vague." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010).

III. This Court generally reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Massey*, 89 F.3d 1433, 1441 (11th Cir. 1996). However, whether "the exclusion of evidence violated a constitutional guarantee is a legal question reviewed *de novo*." *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2019).

IV. This Court reviews claims that the district court improperly limited the scope of a party's cross-examination for clear abuse of discretion. *United States v. Rushin*, 844 F.3d 933, 938 (11th Cir. 2016). But whether a defendant's Sixth Amendment rights were violated is a question that this Court reviews *de novo*. *Id.*

# SUMMARY OF THE ARGUMENT

This Court should reverse Ms. Sutton's conviction for several reasons. First, the government offered insufficient evidence that Ms. Sutton committed Hobbs Act extortion for four reasons. There was no evidence that Ms. Sutton knew that Veasley harbored any fear or that she did anything to exploit his fear. Any fear of a financial loss had to be regarding some thing which Veasley already had, rather than a possible future interest. It was not reasonable for Veasley to believe that Ms. Sutton unilaterally had the power to cancel the Tetra Tech contract. And, it was not reasonable for Veasley to believe that Ms. Sutton would take any action to cancel the Tetra Tech contract.

Second, this Court has held that "fear" under the Hobbs Act Extortion statute means "a state of anxious concern, alarm or anticipation of harm." In a case where there is no affirmative or even insinuated threat, "extortion" based on "fear" in the Hobbs Act extortion statute is void for vagueness as applied to Ms. Sutton's conduct, because it fails to give ordinary people fair notice of the conduct it punishes and is so standardless that it invites arbitrary enforcement.

Third, the trial court violated Ms. Sutton's Fifth and Sixth Amendment rights to present a complete defense by excluding expert testimony bearing on Ms. Sutton's state of mind, including evidence of █

████████████████████████████████████████████

██████████ at the time of the charged crime, evidence of which bears on her state of mind. The constitution requires that a Defendant be allowed to present a complete defense and the evidence was not precluded by the Insanity Defense Reform Act, which does not ████████████████████ ██████████████████ evidence to negate *mens rea* in a specific intent crime. The trial court violated Ms. Sutton's Sixth Amendment right to present a complete defense and meet the government's evidence of *mens rea* in a specific intent case by excluding the ██████████████████████ ██████ expert testimony.

Finally, the Court violated the Fifth and Sixth Amendment when it precluded Ms. Sutton a meaningful opportunity to present a complete defense by precluding her impeachment by omission on the government's sole witness as to Hobbs Act extortion by fear. These errors affected Ms. Sutton's fundamental rights and the conviction must be reversed.

# ARGUMENT AND CITATION OF AUTHORITY

## I.  The Government Offered Insufficient Evidence of Hobbs Act Extortion.

In *Jackson v. Virginia*, the Supreme Court stated, "the critical inquiry on review of sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, *but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt*."  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979) (emphasis supplied).  "If there is a lack of substantial evidence, viewed in the Government's favor, from which a reasonable factfinder could find guilt beyond a reasonable doubt, the conviction must be reversed."  *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989).

In ruling on such a motion, this Court "'determine[s] whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'"  *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997); *United States v. Hansen*, 262 F.3d 1217, 1236 (11th Cir. 2001).  This Court also must accept reasonable constructions of the evidence and credibility choices made by the jury.  *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir. 1984).

"If, however, the record reveals a lack of substantial evidence from which a fact-finder could find guilt beyond a reasonable doubt, we must reverse the defendant's conviction." *Harris*, 20 F.3d at 452. Here, the record reveals a lack of substantial evidence from which the jury could have found Ms. Sutton guilty of extortion beyond a reasonable doubt on the element of fear of financial harm.

### A.     No evidence of knowledge or exploitation of fear

Where the accused does not threaten the victim or instill fear, the accused must, at a minimum, *knowingly exploit* a fear the victim harbors. *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir. 1984). The record here is devoid of any evidence that Ms. Sutton "used" any fear Veasley may have harbored, because the government failed to offer any proof sufficient for the jury to find that Ms. Sutton "exploited" or was aware of any fear of Veasley.

The evidence offered regarding Ms. Sutton's knowledge, actions and state of mind in 2014 is limited to the recordings between Veasley and Williams and between Ms. Sutton and Williams, as well as the testimony of Veasley and Williams. While the testimony established that Ms. Sutton asked Veasley for money, no testimony or recording provided any evidence that Ms. Sutton exploited any fear harbored by Veasley. (Doc. 202 at 62). Ms. Sutton never made a direct or implicit threat of any kind. There was no testimony that Ms. Sutton connected the money to any current

contract or even to any future work by Veasley.  (Doc. 202 at 107, 133).
Had Ms. Sutton ever made or even intimated such a threat, surely Veasley
or Williams would have testified about it and would have captured it in a
recording. No such evidence was offered.

Not only did the government offer no proof that Ms. Sutton
undertook any action to "exploit" Mr. Vealsey's supposed fear, but the
government completely failed to offer any evidence that Ms. Sutton even
knew or was advised that Veasley was fearful, or about what he was
fearful.  Despite Veasley and Williams both testifying, and the admission of
the contemporaneous recordings, there was no evidentiary support for a
jury finding that Ms. Sutton was ever advised that Veasley had fear that
she would retaliate in her position as a Commissioner.  Indeed, the
conversations centered not on Veasley harboring fear of retaliation for
failure to give her money, but rather on three contrary things: (1) Ms.
Sutton not wanting anyone to know she was accepting money from
Veasley and therefore wanting to use Williams as a middleman;[5]  (2)
Veasley's surprise about the time, place and manner in which she asked

---

[5] (See Doc. 202 at 71("So for her to go to Morris and ask him to be the
middleman on a payment scheme seemed dumb to me.  Like why would
you put somebody else in that loop?"); Government Exhibit 14: June 2, 2014
recorded conversation between Williams and Ms. Sutton (Morris Williams:
"That's what he told me.  He don't want me in it.  Okay.  That's what he
said.")).

him for money;[6] and (3) Williams telling Ms. Sutton that Veasley not wanting Ms. Sutton's son, Brian, involved, thought he might be getting set up, and wanted to know what the money was for.[7] The court found there was testimony to support that Ms. Sutton knew about Veasley's fear, since she knew Veasley had been fired in 2011 (three years before this event), she was aware that Veasley would make a lot of money from the Tetra Tech contract, she had tried to have someone else added to the contract over a year prior to the asking for money and she asked Veasley, a subcontractor,

---

[6] (Doc. 202 at 62-65, 70 ("I was in total shock she would do that in front of a lot of people.")).

[7] Veasley testified:

> Q:     Why were you asking Mr. Williams what should I do?
>
> A:     I mean, he's advised me over the years. He's a very seasoned government guy. And that's the basis of our friendship from way back when is he's very savvy in his knowledge of how government operates. So I was like, what should I do with this. That was -- I was asking for advice, more or less.

(Doc. 202 at 72, 86 ("Brian was a liability and he was going to get everybody caught up in a situation by putting him in the middle of this[.]"); Government Exhibit 15, July 10, 2014 ("He don't know you know he want to know what am I doing? I said well I'll find out. I don't…just taking care of him I mean you got to tell me something." (Morris Williams)); ("Reggie, because he he's all he's all flustered right now. He said is Brian I'm being set up? That's what he said. I said no. She just want do that but I'll get back in the game. That's what I told him." (Morris Williams))).

for money. (Doc. 218 at 8). However, none of these facts, singly or together, are evidence that she actually knew he was fearful or exploited that fear - at most, they are evidence that she knew he had money to pay her. And the simple asking of money, without something more, is something politicians do every single day. The court's reasoning comes down to a prohibition from ever asking a subcontractor for money. That, though, is not what Congress meant by extortion.

Indeed, one would expect, had there been exploitation of Veasley's "fear," Ms. Sutton would have said or done something when Veasley did not pay what she asked. However, the government offered no evidence to suggest any behavior on Ms. Sutton's part from which a finding of "exploitation" could be inferred when Veasley did not pay her what she asked, even though this happened two separate times.

The first time was when Veasley testified that Williams told him that Ms. Sutton was asking for $1,000. (Doc. 202 at 84-85). Veasley testified, describing the recording on July 23, 2014, "Well, I was expressing to him that I wasn't going to pay her no thousand dollars, and he was like, well, I'll go back and tell her. I said no, I'll tell her myself. I don't have a problem with telling her." (*Id.*). Veasley also testified, through cross-examination, that the July 23, 2014 recording referenced a conversation between Ms. Sutton and him about Ms. Sutton's Legal Defense Fund, (Doc. 202 at 111), and the money Veasley gave to the Legal Defense Fund was a

"goodwill gesture." (Doc. 202 at 160).[8] Veasely further testified that he did not pay Ms. Sutton a $1,000 payment as Williams suggested, but he did pay her $500 on a second occasion. (*Id*. at 92). What is clear is that Ms. Sutton did not behave in any retaliatory way or make any arguably threatening remarks.

In addition, Veasley testified that he did not pay any additional money to Ms. Sutton after being approached by the FBI. (*Id*. at 95). The jury heard no testimony suggesting that Ms. Sutton reached out to Williams or Veasley and demanded money or threatened Veasley in any way. What is clear here, as well, is that Ms. Sutton did not behave in any retaliatory way or make any arguably threatening remarks.

No evidence was presented by the government to support an inference that Ms. Sutton even knew that Veasley harbored any "fear." Certainly no evidence was presented that could support an inference that Ms. Sutton exploited Veasley's "fear."

---

[8] Veasley testified:

> Q.     And when you used the phrase "goodwill gesture," was that about those two payments from the summer of 2014 or about that payment to the legal defense fund later?

> A.     Legal defense fund.

(Doc. 202 at 160).

## B. The fear must be of loss of something Veasley already has, not a future interest.

Additionally, to satisfy the element of the offense, the "fear" must be of a loss of something Veasley already had. The fear of "losing a potential benefit does not suffice." *United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995); *United States v. Capo*, 817 F.2d 947, 954 (2nd Cir. 1987) (finding no extortion by fear of economic harm where "all the evidence points to the conclusion that they paid voluntarily to improve their chances to get jobs they had not been able to obtain on their own"). The government must prove - at the very least - the existence of the victim's belief that the defendant had the power to harm him and the victim's fear that the defendant would exploit that power. *United States v. Garcia*, 907 F.2d 380, 383, 385 (2nd Cir. 1990) (reversing conviction where victim merely hoped for improved chances on future contracts, because paying for beneficial activity "is not the mindset of a victim of economic extortion").

Here, all the evidence proves that any "fear" Veasley had was that he might not get a future benefit. To put Veasley's "fear" in context, it is important to note that he understood that the Tetra Tech contract was a year contract and each year's contract had to be awarded anew, as he testified: "Well, you have to go back to the Board of Commissioners every year for them to approve the next year's contract. So if they decide not to approve it, then all bets are off. You could basically have to stop working." (Doc. 202 at 46). Veasley testified that he was unaware of the auto-renewal provision in the contract between DeKalb County and Tetra Tech. (Id. at

143).  Thus, Veasley's testimony shows that as he understood it, the next year's contract was not something Tetra Tech was already awarded, but rather, was a possible future benefit.  When asked about his fear, Veasley testified:

> Q.    But why did you do it?
>
> A.    Afraid of the retaliation.
>
> Q.    What does that mean?
>
> A.    I mean, *I had a lot to gain moving forward* -- the program in DeKalb County, right, is worth a billion dollars.  They are going to spend a billion dollars on their sewer system.  So I have been working for this my whole life.  And *this was the greatest opportunity* for me to make -- make a way for my family.
>
> So I could lose if she went against me.  I could lose lots.  I mean, lots of contracts, *lots of everything if she had my future in her hands* like that.
>
> Q.    When you say you could lose a lot, Mr. Mr. Veasley, had those option years or those renewal years come up on a Snapfinger contract yet?
>
> A.    That and -- no, none of them had come up yet.  But then there were subsequent contracts that we were bidding on that we were successful on that we still had to go through her subcommittee to get approved.  So it wasn't just one contract that she could kill me on.  She could kill me on several.

(Doc. 202 at 94-95) (emphasis supplied).  He did not testify that he feared losing the contract with Tetra Tech that he was currently working on.  He testified that he had a lot to gain and that his "future was in her hands." His testimony is clear that he wanted future contracts - the "renewal years"

26

and the "subsequent contracts that we were bidding on." Thus, there was insufficient evidence presented at trial from which the jury could reasonably find that Veasley feared losing a contract that he already possessed, even if he may have feared not getting future projects.

### C. It was not reasonable for Veasley to believe that Ms. Sutton had the power to cancel the Tetra Tech contract.

Veasley's fear must be reasonable. *United States v. Kopituk,* 690 F.2d 1289, 1328 (11th Cir. 1982); *United States v. Quinn*, 514 F.2d 1250, 1266-76 (5th Cir. 1975). The government must prove the existence of the victim's belief that the defendant had the power to harm him and the victim's fear that the defendant would exploit that power. *United States v. Garcia*, 907 F.2d 380, 383, 385 (2nd Cir. 1990). Here, the evidence, taken in the light most favorable to the verdict, shows that it was not reasonable for Veasley to believe that Ms. Sutton had the power to unilaterally cancel the Tetra Tech contract. The Tetra Tech contract automatically renewed for a term of four years. (Doc. 203 at 183). In order to cancel the contract, the CEO would have had to take some action. (Doc. 204 at 88). Even then, Ms. Sutton was one of six votes in the summer of 2014. As the jury heard Williams tell Veasley in Government's Exhibit 16, the Board was split 2-2-2. (Doc. 2004 at 87). Ms. Sutton's one vote could not cancel the contract even if the CEO wanted it canceled.

Veasley was not a novice and had worked in the industry for twenty-eight years. (Doc. 202 at 37). He had knowledge of the DeKalb County purchasing policy, process and vetting. (*Id*.). He was well aware that there

were procedures and checks and balances and that one Commissioner could not cancel a contract.   Moreover, Veasley and Williams were personal friends and were very close. (*Id.* at 66).  Veasley testified: "I mean, he's advised me over the years. He's a very seasoned government guy. And that's the basis of our friendship from way back when is he's very savvy in his knowledge of how government operates."  (*Id.* at 71).  The evidence showed that Veasley and Williams spoke frequently and all of their conversations during this time were not recorded.  Nonetheless, the recordings do bear out that they discussed the situation thoroughly, and Veasley sought Williams's advice.  (*Id.*).  "So I was like, what should I do with this. That was -- I was asking for advice, more or less."  (*Id.*).

After engaging in those conversations with Veasley and advising him, Williams testified that Veasley was comfortable with the consequences if he did not give money to Ms. Sutton.  (Doc. 202 at 129).  The only thing Ms. Sutton could do was vote no, and she only had one vote.  (Doc. 204 at 129-130).  It was simply not reasonable for Veasley to believe that Ms. Sutton had the power to unilaterally cancel the Tetra Tech contract.

**D.    It was not reasonable for Veasley to believe that Ms. Sutton would take any action to cancel the Tetra Tech contract.**

First, Ms. Sutton never suggested in any way that she would do anything to harm Veasley if he did not give her money.  Indeed, when he did not give her $1,000, which Williams said she requested, she took no action at all.  When Veasley did not give her money after the FBI came to

28

see him, she took no action at all. She never threatened any kind of negative action and there was no reason to believe that she would retaliate, and certainly there was no testimony about any retaliatory threats or conduct she had ever displayed.

The government must prove both the existence of the victim's belief that the defendant had the power to harm him and the victim's fear that the defendant would exploit that power. *Garcia*, 907 F.2d at 383, 385. While Veasley testified that he was "afraid of retaliation" because Ms. Sutton had his "future in her hands," he never testified that he *actually believed* that she would take any retaliatory actions if he did not pay her. Instead, he stated that "fear of retaliation" meant that he had "a lot to gain" with future projects not a fear that she would actually take retaliatory action. While the payment to Ms. Sutton may not have been appropriate, it was more like buying an insurance policy, not extortion by fear.

Second, Ms. Sutton's political capital rode with the successful completion of the contract by Tetra Tech. She voted for the contract in 2013. This is important because it puts into perspective Veasley's testimony that he and Ms. Sutton had a conversation a year earlier (summer of 2013) about why Barry Bennett was not a Tetra Tech subcontractor, but then went to see her in May 2014 to make sure there was no animosity. (Doc. 202 at 64). When that conversation took place in the summer of 2013, the Request for Bids had not even been published. Once it was published and the bids were filed, a thorough vetting of the bids was

done by the Purchasing Department. After a few meetings, the subcommittee, on which Ms. Sutton sat but was not the chairperson, approved the Tetra Tech bid and then the whole Board, including Ms. Sutton, voted to approve the Tetra Tech bid. There was no evidence that Ms. Sutton asked anyone for money in order to vote for the Tetra Tech bid. Then, according to Veasley's testimony, almost a year later the lunchroom conversation takes place. The timing of the lunchroom conversation undermines the suggestion that Ms. Sutton's request for $500 was an attempt to extort money for the contract that had already long-ago been awarded.

Third, the Consent Decree had specific timelines when work had to be done. As Williams testified, if a commissioner did something to derail that, the county would be paying millions of dollars in fines. It is patently unreasonable to believe that Ms. Sutton would sacrifice a necessary billion-dollar project for a $500 payment. Such action would result in political destruction.

The government offered no prior behavior on Ms. Sutton's part consistent with an extortionate act. They offered no testimony that she said anything that could be construed as a threat to do so. They offered no evidence of conduct by Ms. Sutton which would warrant such a fear. The government simply offered no evidence that it was reasonable for Veasley to believe that Ms. Sutton would do anything to undermine the Tetra Tech contract.

## II.    "Extortion" Based On "Fear" In The Hobbs Act Extortion Statute Is Void For Vagueness As Applied To Ms. Sutton Conduct.

A criminal statute or regulation is void for vagueness in violation of the Due Process Clause of the Fifth Amendment if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 USC 1951(a).  And, the term "'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id.* "Fear" means a state of anxious concern, alarm, or anticipation of harm. Eleventh Circuit Criminal pattern Jury Instruction O70.1.

The Supreme Court has set out "three related manifestations of the fair warning requirement."  *United States v. Lanier*, 520 U.S. 259, 265 (1997). "First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  *Id.* (citation and quotation omitted).  "Second, as a sort of

junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id*. at 266 (same). "Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (citations omitted).

Ultimately, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267. Thus, for example, criminal laws prohibiting grocers from charging "unreasonable rates," or criminal laws requiring people stopped by the police to provide "reasonable assurance" that an ID is authentic, have been found to be unconstitutionally vague. *See United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921); *Kolender v. Lawson*, 461 U.S. 352, 359 (1983).

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Applied to Ms. Sutton's conduct, Hobbs Act extortion by fear of economic loss is so vague that it did not give Ms. Sutton fair warning that her conduct was wrongful.

While the facts of this case might show that Ms. Sutton perhaps should have known that her request for $500 from Veasley put him in an uncomfortable situation, or that he might be in fear or even that he might think that she would exploit her power to hurt him if he did not pay. But no one would think that without some further action on her part, Ms. Sutton's actions were sufficient to be criminal under the statute, especially since neither Veasley nor Williams ever told her that Veasley was reluctant to give her the funds.

That this simple request for money would be criminalized by a statute in the Racketeering Chapter of the Code, and with a statute entitled "Interference with Commerce by Threat and Violence," seems bewildering and out of place. Such an interpretation is contrary to the "whole-text" cannon, as well. *In re Cumbess*, 960 F.3d 1325, 1333-34 (11th Cir. 2020) ("Under the whole-text canon, courts should consider the entire text of a statute, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text." (cleaned up)). If the application of this statute to these facts is not void for vagueness, then we have a statute that criminalizes a request for money without any threat, the same as a robbery at gun point or a mobster's threat to break someone's kneecaps if they don't pay up. One of these things is just not like the others, and it doesn't belong.

As noted above, the rule of lenity is "a sort of junior version of the vagueness doctrine" and "ensures fair warning by so resolving ambiguity

in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266. For the same reasons mentioned above, the statute does not "clearly cover[]" the charged conduct. As such, it should be construed in favor of the criminal defendant. *See United States v. Canniff*, 955 F.3d 1183, 1191-92 (2020) (applying rule of lenity and declining to construe "any notice" to include private text messages even though a broad conception of "any notice" could include it).

The rule of lenity is a canon of statutory construction that requires "ambiguity in a statute defining a crime or imposing a penalty [] be resolved in the defendant's favor." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW at 296 (Thomson/West 2012); *see also United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) (explaining that the rule "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"). Where there exist two rational readings of a criminal statute, one harsher than the other, the rule of lenity requires we choose the harsher one only when Congress has spoken "in language that is clear and definite." *United States v. Bass*, 404 U.S. 336, 347 (1971). The late Justice Antonin Scalia and Bryan Garner offered a rule-of-lenity call to arms: "The rule . . . is often overlooked when it ought to apply" and "it might fairly be said that the rule of lenity is underused in modern judicial decision-making—perhaps the consequence of zeal to smite the wicked." SCALIA & GARNER at 300-01. "The defendant has almost always done a bad thing, and the instinct to punish the wrongdoer

is a strong one. But a fair system of laws requires precision in the definitions of offenses and punishments." *Id.* "The rule of lenity tips the scales in favor of the defendant by requiring the court to impose the lesser of two penalties." *Chapman v. United States*, 500 U.S. 453, 463 (1991).

In *Wooden v. United States*, Justice Neil Gorsuch echoed that view:

> The rule of lenity has a critical role to play . . . Under our rule of law, punishments should never be products of judicial conjecture about this factor or that one. They should come only with the assent of the people's elected representatives and in laws clear enough to supply "fair warning . . . to the world."

*Wooden,* 142 S. Ct. 1063, 1086–87 (2022).  This Court should apply the rule of lenity here unless it finds that the statute is void for vagueness as applied to Ms. Sutton.

## III. The Court Violated Ms. Sutton's Fifth and Sixth Amendment Right to Present A Complete Defense by Excluding Expert Testimony About Ms. Sutton's ███████████ ███████████████████████ At The Time Of The Charged Crime, Evidence Of Which Bears On Her State Of Mind In A Specific Intent[9] Case.

### A. The Fifth and Sixth Amendments require that a Defendant be allowed to present a complete defense.

The Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).   This is true, whether

> rooted directly in the Due Process Clause . . . , *Chambers v. Mississippi,* [410 U.S. 284 (1973)], or in the Compulsory Process

---

[9] It was undisputed that all crimes charged were specific intent crimes, and the trial court made such a finding.  (Doc. 109 at 1).

or Confrontation clauses of the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23 (1967); *Davis v. Alaska*, 415 U.S. 308 (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S., at 485 [1984]; *cf. Strickland v. Washington*, 466 U.S. 668, 684–685 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment").

*Id.* (citations shortened). Ms. Sutton's opportunity to present her defense was an empty one since the court excluded competent, reliable evidence bearing on Ms. Sutton's specific intent when such evidence was central to her the claim of innocence. The exclusion of this kind of exculpatory evidence deprived Ms. Sutton of "the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *United States v. Cronic*, 466 U.S. 648, 656, (1984). *See also Washington v. Texas*, 388 U.S., at 22–23.

While the Insanity Defense Reform Act ("IDRA"), 18 U.S.C. § 17, limits the use of evidence of a ██████████████████████████ ████████████████████████ is admissible when it focuses on the defendant's specific state of mind at the time of the charged offense, in a specific intent crime. *United States v. Cameron,* 907 F.2d 1051, 1062 (11th Cir. 1990). Based on its reading of the IDRA, the trial court wrongly precluded Ms. Sutton from introducing her defense though Dr. Lokken. The trial court's ruling was error and violated Ms. Sutton's Fifth and Sixth Amendment rights.

Ms. Sutton should have been allowed to offer ████████ ████████████████ evidence of her state of mind to the jury to support the inference that she "actually lacked *mens rea*," *i.e.,* evidence that Ms. Sutton's seemingly criminal behavior could equally be explained by reference to ████████████████████████████████████████ ████ *United States v. Bates,* 960 F. 3d 1278, 1288 (11th Cir. 2020). Ms. Sutton made it clear that Dr. Lokken would not testify as to the ultimate issue, but rather, would provide only sufficient detail to allow the jury to draw or not draw the inference, and Dr. Lokken would not be asked to opine that Ms. Sutton was not capable, or lacked the capacity, to form the requisite intent. *Bates,* 960 F.3d at 1288; *see also United States v. Gillis,* 938 F.3d 1181, 1194 (11th Cir. 2019).

Despite the evidence before it, the district court excluded the testimony, pursuant to the IDRA, wrongly finding that "Sutton seeks to present testimony that excuses her actions because she failed to adequately 'reflect upon the consequences of [her] actions.'" (Doc. 109 at 21). Ms. Sutton's defense was not that she did not reflect on the consequences of her actions, but rather that her actions were not wrongful in the first place and that the behaviors that the government would argue to show that her actions were wrongful were attributable to a different cause: ████████ ████████████████ Ms. Sutton suffered prior to the summer of 2014 coupled with the manipulation by the government's cooperator, Williams.

The Court also found that:



(Doc. 109 at 20).

Contrary to the Court's holding, Ms. Sutton explained that there was no direct evidence of Ms. Sutton's intent and the government would argue that her behavior showed consciousness of guilt. (Doc. 101 at 23-24). Indeed, that is exactly what the government did argue in its closing argument. (Doc. 206 at 11, 16, 30, 38, 41, 49, 53). For instance, the government focused a great portion of its opening and closing arguments on the fact that Ms. Sutton wrote $500 down on paper in a room filled with people and its assessment that this act inherently showed her conduct was wrongful. (Doc. 206 at 10). Dr. Lokken's testimony about the fact that Ms. Sutton wanted the donation to be private so that others would not learn of █████████████████████████ would have put this conduct in context and would have offered an innocent explanation for what the government argued was consciousness of guilt. (Doc. 212, Exh. B at 11 ("████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ ")).

The government framed Ms. Sutton asking Williams to put his phone in the trunk as "a pattern here of concealment, of consciousness of guilt, a glimpse into the defendant's corrupt mind." (Doc. 206 at 16).  On the contrary, the jury was not allowed to hear evidence of Ms. Sutton's true state of mind.  Had the jury heard from Dr. Lokken, the defense against this argument would have been strong.

████████████████████████████████████████

████████████████████████████████████

████████████████





(Doc. 212, Exh. B at 4-5). This testimony would have also explained why she wanted Williams or her son to receive the money from Veasley, because she felt paranoid after being harassed, surveilled, and hounded, and it would have offered a counterpoint to the government's arguments about that conduct as well. (Doc. 206 at 30). But the Court erroneously took Ms. Sutton's defense against this impactful government argument away from her by excluding the testimony.



(Doc. 212, Exh. B at 3-4) (emphasis supplied).

In addition to negating the government's argued inferences regarding her state of mind and intent, this testimony would have supported and bolstered the arguments made by the defense in closing to counter the government's narrative:

- Ms. Sutton was paranoid because she was being politically attacked from all directions, which explained some odd behaviors, such as asking Williams to put the phone in the trunk and writing the legal defense fund donation on a piece of paper in a room full of people. (Doc. 206 at 38, 41).

- Ms. Sutton had sworn enemies on the Board and was at odds with the powerful CEO. (*Id*. at 38).

- Ms. Sutton was manipulated by Williams into asking Veasley for money for her Legal Defense Fund, thinking that Veasley knew what the request for funds was about, but Mr. Williams instead set her up to look like she was extorting money from Veasley. (*Id*. at 49, 53).



██████████████████████████████████

████████████████████████████████

███████████████████████████

█████████████████████████████████

████████████████████████████████,

but it was constitutional error to completely exclude the testimony on this basis, depriving Ms. Sutton of her right to present a complete defense.

A similar issue was addressed by Judge Jordan in his concurrence in *United States v. Litzky*, 18 F.4th 1296 (11th Cir. 2021). There, he candidly described the sometimes-complex interplay between the Insanity Defense Reform Act ("IDRA"), Rule 704(b), and the Eleventh Circuit's caselaw. To Judge Jordan, it is like "threading [a] needle." *Id.* at 1309 (Jordan, J., concurring). But in reconciling these standards, he suggests that "in a case involving a specific intent crime, an expert can testify as to the 'typical effect' of a condition on a 'person's mental state' and allow the jury to draw (or not draw) the ultimate inference as to the defendant's intent (or lack thereof)." *Id.* Finally, the defense suggested a limiting instruction could be given. To undermine any suggestion of confusion, "the jury can be instructed that the expert's opinion is solely for their assistance, and subject to their complete rejection if they consider it unreliable." *United States v. Williams*, 583 F.2d 1194, 1200 (2d Cir. 1978). This faith in the intelligence and good sense of the jury extends to its ability to cast a critical eye on psychiatric testimony. *See Barefoot v. Estelle*, 463 U.S. 880, 901 n. 7 (1983)

("[D]oubts about the usefulness of psychiatric predictions can be called to the attention of the jury. Petitioner's entire argument ... is founded on the premise that a jury will not be able to separate the wheat from the chaff. We do not share in this low evaluation of the adversary process.") (emphasis added).









**C. The trial court violated Ms. Sutton's Fifth and Sixth Amendment right to present a complete defense and meet the government's evidence of *mens rea* in a specific intent case by excluding ███████████████████ expert testimony.**

Expert testimony regarding ████████████ issues bearing directly on Ms. Sutton's state of mind in 2014 was admissible because it was probative of the *mens rea* element of the charged crime of extortion by fear of economic loss. As set out above, this evidence formed the backbone of the defense. Worse still, its absence allowed the government to argue that Ms. Sutton's secretive and paranoid behavior had no cause other than consciousness of guilt of the charged crime. By excluding the evidence, the trial court denied Ms. Sutton the right to present a complete defense.

**IV. The Court Precluded Ms. Sutton A Meaningful Opportunity To Present A Complete Defense By Precluding Her Impeachment By Omission On The Government's Sole Witness As To Hobbs Act Extortion By Fear.**

It was essential to the theory of the defense that Veasley, the alleged victim in this case, was not credible in his testimony regarding his fear. In refusing to allow the confrontation and impeachment of Veasley by omissions he made in his grand jury testimony, the trial court violated Ms. Sutton's right to present a defense and her confrontation rights.

The Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690.

Impeachment of the government's main witness is undoubtably part of the right to present a complete defense and the right to due process, and the Sixth Amendment's Confrontation Clause guarantees a criminal defendant an opportunity to impeach adverse witnesses through cross-examination. *United States v. Arias-Izquierdo,* 449 F.3d 1168, 1178 (11th Cir. 2006). The right to cross-examine a witness is particularly important where the witness is the government's chief witness. *Id*.

> The Supreme Court has explained that:

> Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

*United States v. Abel,* 469 U.S. 45, 52 (1985).

> Impeachment by omission is unquestionably a fundamental Confrontation right of the defendant. In *Jencks*, the Supreme Court clearly recognized that impeachment by omission is important to the testing of credibility by cross-examination:

> Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The *omission from the reports of facts related at the*

48

> *trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.*

*Jencks v. United States*, 353 U.S. 657, 667 (1957). The Eleventh Circuit has long recognized impeachment by omission. *See, Castillo v. United States*, 409 F.2d 762 (5th Cir. 1969)[10] ("The omission from the statements were, of course, proper subject for impeachment of the agent, and the defense employed the statements for that purpose.")

The Supreme Court has also noted that the Federal Rules of Evidence specifically allows the cross-examination to uncover such bias:

> A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony.

*Abel,* 469 U.S. at 52 (emphasis supplied).

A district court may limit the scope of a defendant's cross-examination without infringing her Fifth and Sixth Amendment rights, but only if the permitted cross-examination exposes the jury to facts sufficient for it to draw inferences regarding the witnesses' credibility and enables

---

[10] All opinions of the Fifth Circuit before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

defense counsel to make a record to support her arguments that the witness was biased. *Rushin*, 844 F.3d at 938. Once a defendant engages in cross-examination sufficient to satisfy the Confrontation Clause, "further questioning is within the district court's discretion." *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994).

Here, however, the record shows that the district court did not allow sufficient cross-examination because it misunderstood the concept of impeachment by omission. The defense attempted to use Veasley's grand jury testimony to show he was asked a broad question ("How did she make the request"), thus his inclusion of some facts ("she wrote down the number and slid it to me") but omission of other facts ("mouthed once a month") not only bolstered the defense's argument that Ms. Sutton never even "mouthed once a month" and that testimony was not credible, but also would undermine Veasley's credibility as a whole. Not allowing the full testing of the witness's credibility through the crucible of cross-examination was erroneous.

## CONCLUSION

As set forth above, the trial court committed reversable error.  Ms. Sutton asks that this Court reverse her conviction and remand for a new trial.

MILDRED GECKLER DUNN
V. NATASHA PERDEW SILAS
Counsel for Sharon Barnes Sutton

**CERTIFICATE OF COMPLIANCE AND SERVICE**

This is to certify that the foregoing brief is in compliance with Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in Book Antiqua 14 point, a proportionally-spaced typeface, using the Microsoft Word 365. Moreover, this brief also complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it includes no more than 13,000 words, according to the same software. Finally, on the date set forth below, counsel uploaded this brief to the Court's web site, which promptly served opposing counsel:

> VICTOR R. SALGADO
> PUBLIC INTEGRITY SECTION
> CRIMINAL DIVISION
> U.S. DEPARTMENT OF JUSTICE
> 1301 NEW YORK AVENUE, NW
> WASHINGTON, D.C. 20530

August 15 , 2023.

> MILDRED GECKLER DUNN
> Federal Defender Program, Inc.
> 101 Marietta St., NW, Suite 1500
> Atlanta, GA   30303
> (404) 688-7530
> Millie_Dunn@FD.org
>
> Counsel for Sharon Barnes Sutton